Filed 1/21/21  P. v. Miranda CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>STEVEN COREY MIRANDA,<br><br>    Defendant and Appellant. | F078650<br><br>(Super. Ct. No. F18903285)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Cameron M. Goodman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

During an argument with his girlfriend, defendant Steven Corey Miranda discharged a firearm at a vehicle in which his girlfriend was fleeing with two others. As a result of this incident, defendant was charged and convicted by jury of three counts of assault with a firearm (Pen. Code, § 245, subd. (a)(2); counts 1–3),[1] shooting at an occupied vehicle (§ 246; count 4), and discharging a firearm with gross negligence (§ 246.3, subd. (a); count 5). The jury also found true firearm enhancement allegations under section 12022.5, subdivision (a), as to counts 1, 2 and 3. At a bifurcated proceeding, defendant admitted his prior felony conviction under section 245, subdivision (a)(4), and the court found him guilty of being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 6).

Defendant was sentenced to an aggregate term of 14 years as follows. The court imposed the upper term of four years for count 1 (§ 245, subd. (a)(2)), plus an additional 10 years for the firearm enhancement (§ 12022.5, subd. (a)); the upper term of four years was imposed as to both counts 2 and 3 (§ 245, subd. (a)(2), each term to run concurrent to count 1, plus 10 years on each count for the firearm enhancement (§ 12022.5, subd. (a)), which were each stayed under section 654; the midterm of five years was imposed for count 4 (§ 246), to be served concurrently with count 1; the term of two years was imposed for count 5 (§§ 246.3, subd. (a), 667, subd. (e)(1), 1192.7, subd. (c)(1)) to be served concurrently with count 1; and 16 months was imposed on count 6 to be served concurrently with count 1 (§§ 18, 29800, subd. (a)(1)).

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I. Prosecution Evidence

### A. The May 2018 Incident and Investigation

About 12:30 p.m. on May 15, 2018, Fresno County Sheriff's deputies were dispatched to a Wal-Mart in Selma to investigate a 911 call reporting shots fired at a vehicle occupied by the driver (Joseph H.) and two passengers (K.F. and Lisa R.). Lisa placed the 911 call, which was played for the jury; deputies met with the three occupants of the car at a Wal-Mart parking lot to investigate.

Deputy Porter testified he interviewed K.F., who said she was hanging out at her boyfriend's (defendant) house on DeWolf Avenue that day, they had gotten into an argument, and she wanted to go home. She said she gave defendant money for gas since her house was a couple of towns away, and defendant left to get gas and was gone about an hour.

K.F. explained to Porter that when Miranda returned he became angry at seeing K.F.'s bags packed and by the door. K.F. said defendant grabbed a .22-caliber rifle, went outside, shot his dog, and then put the gun in his truck and came back inside the house. Once inside, defendant grabbed K.F.'s wrists, grabbed her by the throat, picked her up off the floor while trying to get her phone, and then threw her to the ground. K.F. told Porter she then went into defendant's bedroom and shut the door; he turned on the television outside the room and started watching television.

K.F. said when she used her phone, defendant kicked in the door and again attempted to take the phone away from her. She managed to call her friends to pick her up. When her friends (Joseph and Lisa) pulled up at defendant's house, K.F. ran through the back door with her belongings and got into Joseph's car. Defendant ran outside and retrieved the weapon from the bed of his truck and started firing at Joseph's vehicle. When K.F., Joseph and Lisa discovered defendant had the rifle, they ran into a mailbox

3.

across the road from the house as they were trying to leave, and as they pulled forward onto DeWolf Avenue, K.F. heard something hit the car.

Deputy Joseph Moreda testified that he interviewed Joseph, who told Moreda he did not know who the person was that shot the weapon at his car—Joseph had never seen him before. Joseph said he had been at home in Fresno when he received a message from K.F., his former sister-in-law, who wanted him to pick her up at the DeWolf property. Joseph arrived to pick her up around 12:30 p.m., and K.F. started placing her things in Joseph's vehicle. When she had loaded her things, Joseph saw an Hispanic adult male retrieve a rifle from a pickup truck parked in front of the house. When the person pointed the rifle at the car, Joseph floored the car out of the driveway. Joseph said the shooter was near the pickup truck where the rifle was retrieved. Joseph indicated his vehicle was pulling out of the driveway at DeWolf when his vehicle was struck with what he thought were bullets.

Deputy Aurelio Romero testified he interviewed Lisa, who appeared frightened to him, and Romero took photographs of K.F. and her injuries as well as photographs of the damage to Joseph's car.

Deputy Porter investigated the scene at DeWolf Avenue and found a broken mailbox across the street from the DeWolf residence. He also found two .22-caliber spent casings on the driveway of the DeWolf residence near the front door area, about 60 to 100 yards from the road. Porter did not locate a rifle at the residence or in the vicinity, including at a residence nearby. He did not find any additional shell casings or bullets on the property.

Photographs were taken of the damaged mailbox, but deputies did not go into the DeWolf residence. Porter opined the damage on Joseph's car was consistent with bullet damage. Later that same afternoon, Deputies Romero and Moreda detained and arrested defendant during a traffic stop.

4.

### B. K.F.'s and Joseph's Preliminary Hearing Testimony

Approximately a week after the shooting, K.F. and Joseph were arrested together on another matter. They were both in custody at the time of the preliminary hearing. K.F. denied seeing defendant that day, fighting with him, or being touched by him—she claimed her other former boyfriend had beaten her. K.F. denied defendant shot the dog or fired the weapon at her. K.F. denied speaking with law enforcement about the incident and testified she was shopping with Joseph that day.

Joseph testified he did not remember anything from the day of May 15, 2018, that he had never seen defendant before, and did not recall speaking to law enforcement because he had been on drugs. Joseph also invoked his Fifth Amendment right against self-incrimination as to some of the questions.

### C. K.F.'s and Joseph's Trial Testimony

#### 1. K.F.

K.F. testified at trial she had been dating defendant on and off since February 2018. She had been staying with defendant at his grandfather's house a few days before the incident occurred, and on May 15, 2018, they had an argument. She had ingested methamphetamine at about 6:00 a.m., and defendant had been acting really irritated and agitated that morning. Around 10:00 a.m., while they were arguing, defendant walked outside with a rifle and shot his grandfather's dog. K.F. saw defendant fire a shot at the dog, who was on the side of the house by one of the main hedges near the front door. She heard gunfire, heard a yelp, and saw the dog run away. He came back in the house without the rifle, and she was angry because he shot the dog. She sent a text message to Joseph and Lisa that defendant had shot the dog and that she wanted to leave.

K.F. and defendant started arguing when he came in, and then defendant "left to go take the cans in." K.F. walked out of the house to look for the dog, walking the entire property about three or four times. During her search, defendant helped her look for the

dog. At some point, K.F. offered to pay defendant for gas to take her home, but he did not leave to get gas.

Back in the kitchen ostensibly after the search, they began arguing again. Defendant grabbed her by the arms and held her for just a second, enough to leave a bruise.[2] She remembered telling a deputy that after defendant shot the dog, he returned inside and grabbed her by both of her arms, but did not remember telling the deputy that defendant grabbed her by the neck.

K.F. went into a bedroom, locked the door, started packing her things, and texted Joseph and Lisa that she really needed to go home because she was fighting with defendant. Defendant kicked open the bedroom door and tried unsuccessfully to grab the cell phone. When he came into the room, she was packing her stuff. Then he went to the front of the house and continued to scream and yell at her while she packed her belongings.

Having gathered her belongings, K.F. went out the back door onto the porch to wait, but continued to argue with defendant through the screen door. When Joseph and Lisa pulled into the driveway, K.F. grabbed her overnight bag, and headed toward Joseph's car. Defendant walked outside through the front door. While K.F. was putting her things in Joseph's back seat, she looked up and saw defendant had the rifle in his hands. He pointed the rifle at the car and that was when she jumped in and Joseph took off backwards out of the driveway. Defendant fired the rifle at the car, and Joseph hit a mailbox while backing up. When the car started moving forward away from the mailbox, defendant shot the rifle at the car again and hit the bumper. Defendant fired a third shot and it sounded like it hit near the back tire.

---

[2] The testimony about the search for the dog was elicited in fragmented parts during direct and cross-examination.

Later in K.F.'s direct examination, the prosecutor asked her again about the progression of the shooting in relationship to the location of the car.

"[Prosecutor]: Okay. I'm going to take you back to when you're in the car and you reversed and hit the mailbox. You said that the—when you pulled forward is when [defendant] shot at the car; correct?

"[K.F.:] Yes.

"[Prosecutor:] And you said he hit the bumper?

"[K.F.:] Yes.

"[Prosecutor:] When he shot and hit the bumper, how far was [defendant] standing away from the car?

"[K.F.:] I'm not too sure.

"[Prosecutor:] Okay. You heard gunshots, though; correct?

"[K.F.:] Yes.

"[Prosecutor:] How many in total during that incident did you hear?

"[K.F.:] I heard about three.

"[Prosecutor:] When you pulled forward out onto the street you said he shot again; correct?

"[K.F.:] Yes.

"[Prosecutor:] From this—at this moment in time, do you know how far [defendant] was standing away from the car?

"[K.F.:] No."

On cross-examination, K.F. was questioned again about the progression of the shots fired in relation to the position of the car and defendant. She testified when she jumped into Joseph's car, defendant had the gun in his hands already and he was pointing it at the car. Defendant was standing by the driveway and walking toward them. When they backed up into the mailbox, they lost sight of defendant. Both she and Lisa were yelling at Joseph, telling him to go. When defendant fired the first shot, he was almost at

7.

the road and they were backing up into the mailbox. She testified the second shot was fired when they were pulling forward and had just passed the first neighbor's house on DeWolf. They did not see defendant fire the second shot, but he was already by the road. She heard the third shot fired when they were "about to stop the car in the middle of the road." Joseph stopped the car after traveling forward about 48 or 50 feet, and they saw defendant leaving in his truck driving the opposite direction from Joseph's car. By this time, Lisa had called 911.

K.F. was questioned at length about the variance between her trial testimony and her preliminary hearing testimony. She testified that leading up to the preliminary hearing, she was in custody and had been convicted on another matter. She claimed there were consequences to testifying against other people in custody, including life-threatening danger, and she was reluctant to testify. K.F. had called her mother on June 20, 2018, and discussed being subpoenaed to testify at defendant's preliminary hearing. She told her mother she did not want to testify because she was worried she would get her "ass beat" when she returned "to [her] pod." An audio recording of the phone call was played for the jury. In another phone call with her mother on June 28, 2018, her mother gave her advice about how to testify at the preliminary hearing in a way that would be less than forthcoming about what had happened. She acknowledged she lied at the preliminary hearing because she was scared of retaliation.

### 2. Joseph

Joseph testified K.F. is his former sister-in-law, and they had known each other for about 15 years. He was currently serving a sentence for a felony related to identity theft, which also involved K.F., and he was arrested about six days after the events in this case occurred.

On the day of the incident, Joseph was with his girlfriend Lisa. K.F. contacted them and indicated she needed a ride to her mother's house, but she did not say why. He and Lisa went to the house on DeWolf twice—the first time K.F. texted that she was not

ready to go, so Joseph and Lisa went to get something to eat, and about an hour later they came back a second time to pick her up.

Joseph had been to the house on DeWolf before, but he had never been in it. The house had an oval driveway in front of it, but he situated his car so that its rear bumper was right at the entrance of the driveway just off of DeWolf. It was about 35 or 40 yards to the house. He did not see where K.F. came from when she approached his car. Lisa was in the front passenger seat, and K.F. opened the back, right-side passenger door. She was carrying a backpack and a couple of bags.

K.F. had said something in her text about defendant shooting a dog so she wanted out of there. When she got to the car, she was arguing with someone they could not see. She set her bags down twice before she got to the car while she was engaged in the argument. When she stepped into the car, she suddenly yelled that the person she was arguing with had a gun and they looked up and saw that defendant was going toward a truck, reaching in, and pulling out a rifle. Both K.F. and Lisa began to scream that defendant had a gun, so Joseph put the car in reverse and floored it backwards out of the driveway. Joseph looked up to see that defendant had a rifle, but could not tell what type it was.

Upon backing out of the driveway, Joseph crashed into a mailbox on the opposite side of DeWolf, and then put the car into drive and sped off. He did not see defendant after that, he was focused on the road ahead. After he got about 20 feet down the road, he heard what sounded like three bullets ricocheting off the car. There was a perpendicular street ahead forming an intersection with DeWolf where Joseph stopped. Lisa was already on the phone with 911, and they were waiting to see if defendant would pull out of the driveway in his truck, which he did. Defendant, however, went northbound away from them.

Joseph did not examine his car until he got to the Wal-Mart parking lot and waited for deputies to arrive. He had owned the car for about six months and the damage he

9.

found had not been there before. In a jail visit with his fiancée just before the preliminary hearing, which was recorded and played for the jury, Joseph mentioned to her he was not worried about losing the car because she had seen how he treated the car and he "didn't really care about it." She responded that he was "kind of mean and … violent towards it."

Joseph, too, was questioned at length about the divergence from his preliminary hearing testimony. He claimed he had not wanted to testify at the preliminary hearing because he was in custody in the general population. He testified that someone in general population who testifies will get "stomped out," so he was fearful for his safety. Joseph wrote a letter to the district attorney's office stating that he could not testify due to his "'safety.'" The following week, he wrote a similar letter to the district attorney's office stating his "'fear in testifying is the reprisal of other inmates.'" In talking with his fiancée just before the preliminary hearing, Joseph told her that he would plead the Fifth and not testify to avoid having his "throat sliced." Joseph also had a recorded jail conversation with a friend prior to the preliminary hearing, wherein he noted that if he did not testify about what happened, the insurance for his car probably would not pay.

Although Joseph had concerns about testifying at trial, a week before trial he was placed in administrative segregation away from the general population. He went into administrative segregation because a kite had come in saying that they had read the police report, which placed Joseph's life in jeopardy because he was labeled a snitch. Joseph explained that the kite instructed that Joseph was to be taken out, but the "rep" who was in charge of Joseph's prison group said they would not do anything until defendant had a chance to present "'paperwork'" to back up what was in the kite. Joseph was trying not to get "smashed" before the "paperwork" showed up backing up the kite, and that is what made him request a transfer to administrative segregation.

10.

**D. Jail Recordings of Defendant's Conversations**

While in jail, defendant had a phone conversation with his brother, and his grandfather and father visited, and these recordings were played for the jury. During the phone call with his brother, defendant asked if "the cops found the gun." Defendant stated that "[i]t's over there at Giovanni's." When his father and grandfather visited, defendant did not refute his grandfather's contention that he had taken the gun out of his grandfather's bedroom. Defendant also later said that law enforcement did not have "the gun that I use[d] … they don't have no residue on my hands." During another call with his brother, defendant stated that he had "good information" that "everybody's locked up," and defendant indicated he would send out a "kite."

**II. Defense Case**

Defendant presented no affirmative evidence.

## DISCUSSION

**I. Testimony of K.F. and Joseph Constitutes Substantial Evidence**

**A. Standard of Review**

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense[]" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)

"The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio*,

11.

*supra*, 43 Cal.4th at p. 357.) "In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ….'" (*People v. Nguyen*, *supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio*, *supra*, at p. 357.)

### B.    Analysis

Defendant argues there is no legally sufficient evidence that he shot at Joseph's vehicle. Defendant maintains that K.F.'s and Joseph's testimony that defendant shot at the car was inherently improbable, especially given the lack of corroborating evidence. Joseph testified he had not heard what sounded like bullets ricocheting off the car until after he had hit the mailbox and was driving away southbound on DeWolf. K.F. testified when she heard the second shot, she saw defendant standing on DeWolf and when she heard the third shot, Joseph's car was already parked at an intersection on DeWolf. Meanwhile, Lisa indicated in her 911 call that defendant shot at the car while it was backing up toward the mailbox. The only bullet casings found on the property were near the house, not near DeWolf, and the only damage on the car consistent with a bullet was in the back of the car, which was inconsistent in certain ways with how Joseph and K.F. described the shooting. Defendant contends that the testimony of K.F. and Joseph is demonstrably false and cannot constitute substantial evidence to support the verdicts for shooting at an inhabited vehicle (count 4) and negligently discharging a firearm (count 5).

We disagree the trial testimony of Joseph and K.F. was insubstantial and uncreditable by the jury. Except in rare instances of demonstrable falsity, doubts about a witness's credibility should be left for the trier of fact. (*People v. Brown* (2014) 59 Cal.4th 86, 105.) To be rejected as insubstantial evidence on review, the evidence

12.

believed by the jury must represent either a physical impossibility that it is true or the falsity of the evidence must be apparent without resorting to inference or deduction. (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367.)

There is no doubt K.F. and Joseph each had damaged credibility. They both admitted to lying extensively at the preliminary hearing, and they had both been convicted of a fraud crime, further damaging the general veracity of their testimony. K.F. admitted she had ingested some amount of methamphetamine on the morning of the shooting. In their trial testimony, they each gave somewhat differing accounts of the sequence of events. The physical evidence related to the shooting did not conclusively establish the truth of their testimony, either. But none of these issues rendered their testimony about the shooting physically impossible or demonstrably false without resort to any inferences or deductions. (*People v. Brown*, *supra*, 59 Cal.4th at p. 105.)

At the preliminary hearing, K.F. testified that the events of May 15, 2018, never occurred and defendant never shot at Joseph's car, and Joseph testified he could remember nothing about that day. However, there was evidence from which a reasonable jury could have deduced that their preliminary hearing testimony was the product of their fears about testifying against defendant. Both of them were in custody and they each testified there was danger for an inmate in testifying against another inmate. K.F. and Joseph explained that their reluctance to testify truthfully at the preliminary hearing was due to safety concerns, Joseph sent letters to the district attorney's office to that effect, told his fiancée he did not want his throat sliced so he was planning not to testify, and K.F.'s own mother counseled her not to be truthful at the preliminary hearing.

A recorded jail conversation between Joseph and his friend showed he was conflicted about testifying that nothing had happened because he was unsure what would happen to his car insurance claim regarding the damage from the incident. To corroborate that K.F.'s and Joseph's fears were warranted, at trial the prosecutor introduced a recorded jail call between defendant and his brother in which defendant said

13.

he had heard good news that "everybody's locked up" and he was going to send out a kite from which retaliation plans were inferable. In sum, there was a factual basis for the jury to credit Joseph's and K.F.'s trial testimony that they had lied at the preliminary hearing because they were afraid of retaliation.

It is also true that K.F.'s and Joseph's trial testimony was not entirely consistent as to the sequence of how and when defendant fired the weapon at Joseph's car, as well as some other details about which dogs were on the property and exactly when K.F. sent text messages to Joseph and/or Lisa. K.F.'s testimony about when the shots were fired was elicited in stages and it was somewhat difficult to ascertain exactly when she perceived the shots fired relative to the position of the car. She seemed to recall at least one shot was fired while they were still backing up toward the mailbox and that she had seen defendant standing near or on DeWolf when he fired the second shot. Joseph indicated at trial the shots were all fired after his car hit the mailbox, but he had reported to Deputy Moreda he thought two bullets struck the car as he pulled out of the driveway. Lisa's 911 call indicated defendant shot at the car as it pulled out of the driveway in reverse.

Those inconsistencies, however, do not "do violence to reason, challenge credulity, [or] in the light of human experience, emasculate every known propensity and passion of people under the conditions testified to by [people experiencing similar circumstances]." (*People v. Carvalho* (1952) 112 Cal.App.2d 482, 489.) The circumstances about which Joseph and K.F. testified regarding the shooting were chaotic and occurred in an extremely short period of time. Joseph was driving a car and K.F. was confined to the back seat—it is not clear they both had unobstructed views of defendant during the course of the shooting. It is not unimaginable that there would be uncertainty or fluctuation in their recall of the precise moment when they perceived bullets striking the vehicle in conjunction with where the car was located at that exact time. Nothing in these inconsistencies rendered their testimony inherently impossible.

14.

The physical evidence does not render their testimony demonstrably false, either. Two spent bullet casings were found much closer to the house than the road, but it is entirely possible that K.F. was inaccurate when she believed she saw defendant close to or on DeWolf when he fired his second shot. She was admittedly in the back seat of the car, and testified she lost sight of defendant when they backed into the mailbox. It is also entirely possible that defendant *was* near the road, but spent shell casings were simply not discovered in that location. The damage on the car that deputy Porter considered consistent with bullet damage was near the rear bumper and wheel well. If the car was backing out of the driveway, defendant argues no shots fired at the car could have hit the car in those rear locations. But that is only conjecture. Joseph testified he backed the car out in a curved manner so that he was facing south—it is not impossible that the rear bumper and wheel well were exposed to defendant from that vantage point. Further, there was testimony shots were fired while the car was pulling forward after hitting the mailbox and, thus, could have damaged the rear bumper and wheel well at that point. The location of the car damage does not render Joseph's and K.F.'s testimony demonstrably false.

This is unlike the situation in *United States v. Chancey* (11th Cir. 1983) 715 F.2d 543, which defendant asserts is analogous. There, a purported kidnapping victim testified she had not consented to driving with the defendant from Florida to California, despite that she had multiple opportunities to escape and described circumstances that were entirely at odds with being transported across the country against her will. In rejecting the purported victim's testimony as insubstantial, the court explained it could not "escape noticing that walking hand in hand [with the defendant] in the presence of others, riding piggyback [with the defendant] in a public place, declining to take advantage of any number of golden opportunities to ask for help or escape, including not a word in the presence of a policeman, as evidenced by her own testimony, simply cannot pass muster

15.

in the reasonable mind that an individual is being detained and transported against his or her will." (*Id.* at p. 547.)

Nothing about K.F.'s and Joseph's trial testimony is similarly beyond reason and human experience. Their testimony was largely consistent as to the salient factors—they both testified defendant pulled a rifle from his truck and that he pointed it at them, they both testified Joseph took off backwards out of the driveway, trying to flee, and hit a mailbox on the other side of the road, and, most importantly, they both testified defendant fired approximately three shots at the car during their attempt to leave. The mailbox was damaged as they reported, there was damage to the vehicle that was consistent with bullet damage, and there were empty shell casings found on the property from which the jury could reasonably infer were from the incident. Moreover, the 911 call was made contemporaneous with the shooting and indicated Joseph's car had been fired upon. The fact that there was variance in their testimony about exactly when the rifle was fired is *consistent* with the speed and stress of the circumstances.

Distinguishable too were the circumstances in *People v. Casillas* (1943) 60 Cal.App.2d 785, where the reviewing court deemed a witness's trial testimony insubstantial evidence. (*Id.* at p. 794.) There, the defendant was charged with two counts of rape and two counts of incest. The victim, defendant's 15-year-old daughter, testified, upon threats of contempt of court, that her father impregnated her; on cross-examination, she testified she never had sex with her father, and she was only saying that to protect the man who had impregnated her; on redirect, she testified she was really just trying to protect her father because she did not want him to get into any trouble. On recross-examination, she testified she had had sex with both her father and this other individual, and then at the conclusion of the recross examination she said she had never engaged in an act of intercourse with her father. (*Id.* at pp. 788–792.) The court concluded her testimony was so lacking in substantiality as to truth or credibility that it fell far short of the quantum of verity, reasonableness and substantiality required by law in criminal

16.

cases; it was tantamount to no evidence at all sufficient to overcome the presumption of innocence. (*Id.* at p. 794.)

Nothing here is similar to *Casillas*. K.F.'s recounting of the shooting was not entirely consistent, but she did not vacillate in her trial testimony that defendant fired the rifle at the car three times. There was also no corroborating evidence or incriminatory circumstances shown in *Casillas* while there was some evidence to corroborate K.F.'s and Joseph's testimony here. (*People v. Casillas*, *supra*, 60 Cal.App.2d at p. 792.) As already noted, Lisa called 911 during the shooting and reported defendant had in fact discharged a firearm at the vehicle, which corroborated K.F.'s and Joseph's testimony. Moreover, there was damage to the vehicle that was consistent with damage a bullet would cause, even though Deputy Porter could not testify how recently that damage had occurred and even though it was noted in a jail call that Joseph was not careful with his car.

While there were credibility issues and some factual inconsistencies and conflicts the jury had to resolve, those problems did not render K.F.'s and Joseph's testimony demonstrably false or inherently impossible. The jury was entitled to consider the testimony of these witnesses, and it was substantial evidence that could support the verdicts on counts 4 and 5 that defendant discharged a weapon at Joseph's car.

## II. Conviction for Discharge of Firearm with Gross Negligence Must be Stricken

Defendant argues his conviction under section 246.3, subdivision (a), for discharging a firearm with gross negligence (count 5) is a necessarily lesser included offense of shooting at an occupied vehicle under section 246 (count 4) for which he was also convicted, and the trial court erred in allowing both convictions to stand. The People concede the trial court erred in this regard. We agree with the parties that defendant's conviction under section 246.3, subdivision (a), must be reversed as a lesser included offense of section 246 for which defendant was also convicted.

17.

Although section 954 generally permits multiple convictions from a single act or course of conduct, "[w]hen a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*People v. Sanders* (2012) 55 Cal.4th 731, 736.)[3]

There are two tests for determining whether one offense is necessarily included in another: the "'elements test'" and the "'accusatory pleading test[.]'" (See *People v. Lopez* (1998) 19 Cal.4th 282, 288.) When, as here, the defendant is convicted of multiple alternative *charged* offenses, only the statutory elements are considered in deciding whether the defendant may be convicted of both charged offenses. (*People v. Reed* (2006) 38 Cal.4th 1224, 1231.) The elements test views only the statutory elements, not the specific facts of a given case. (*People v. Murphy* (2007) 154 Cal.App.4th 979, 983–984.) The question is whether all the statutory elements of the lesser offense are included within those of the greater offense—i.e., "if a crime cannot be committed without also committing a lesser offense, the latter is a necessarily included offense." (*People v. Ramirez* (2009) 45 Cal.4th 980, 985 (*Ramirez*).)

Section 246 provides that "[a]ny person who shall maliciously and willfully discharge a firearm at an … occupied motor vehicle … is guilty of a felony …." Section 246.3, subdivision (a), provides that "any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense …."

---

[3]     Section 954 provides in relevant part that "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts …. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged …."

As explained in *Ramirez*, section 246.3, subdivision (a), is a necessarily included lesser offense of section 246. (*Ramirez*, *supra*, 45 Cal.4th at p. 990.) "Both offenses require that the defendant willfully fire a gun. Although the mens rea requirements are somewhat differently described, both are general intent crimes. The high probability of human death or personal injury in section 246 is similar to, although greater than, the formulation of likelihood in section 246.3[, subdivision ](a), which requires that injury or death 'could result.' The only other difference between the two, and the basis for the more serious treatment of a section 246 offense, is that the greater offense requires that an inhabited dwelling or other specified object be within the defendant's firing range. All the elements of section 246.3[, subdivision ](a) are necessarily included in the more stringent requirements of section 246." (*Ibid.*)

Defendant was convicted under both section 246 and section 246.3, subdivision (a), from the single act of shooting at Joseph's occupied vehicle. Because section 246.3, subdivision (a) (count 5), is a lesser included offense of section 246 (count 4), appellant may only be convicted of the greater offense: count 4. The conviction for discharging a firearm with gross negligence under count 5 must be reversed.

### III.    Section 654

#### A.    Background

Defendant argues alternatively and additionally that his sentences under counts 4, 5 and 6 should have been stayed under section 654, not imposed concurrently. Defendant maintains his conduct in shooting at Joseph's car was part of defendant and K.F.'s continuing argument and shooting at the car was incident to the same intent and objective of venting defendant's frustration and anger on K.F. Moreover, the multiple victim exception to section 654 does not apply because defendant was convicted of three counts of assault with a firearm, one count for each victim. As to count 6, for being a felon in possession of a firearm, defendant argues he was required to have a weapon to have

discharged it as related to his other offenses, so it was simply incidental to the objective and commission of those offenses.

The People concede the sentence imposed under count 4 should have been stayed under section 654, but dispute that the sentence imposed on count 6, felon in possession of a firearm, should be stayed.[4]

## B.    Standard of Review

Section 654, subdivision (a), provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  The statute "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent."  (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335.)  Determining "[w]hether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry .…"  (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)  "We first consider if the different crimes were completed by a 'single physical act.'  [Citation.]  If so, the defendant may not be punished more than once for that act.  Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single '"intent and objective"' or multiple intents and objectives."  (*Ibid*.)

We review the trial court's express or implied factual findings for substantial evidence, and its conclusions of law de novo.  (*People v. Brents* (2012) 53 Cal.4th 599, 618; *People v. Perez* (1979) 23 Cal.3d 545, 552, fn. 5; *People v. Moseley* (2008) 164

---

[4]    The conviction under count 5 is to be stricken, and whether any sentence imposed for count 5 should have been stayed under section 654 is not considered.

Cal.App.4th 1598, 1603.) We "affirm the trial court's ruling, if it is supported by substantial evidence, on any valid ground." (*People v. Capistrano* (2014) 59 Cal.4th 830, 886, fn. 14, overruled in part on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104; accord, *People v. Brents*, *supra*, at p. 618.)

### C. Analysis

The parties agree the sentence on count 4 should have been stayed under section 654, and we concur. There is a multiple victim exception to section 654 that allows separate punishment for each crime of violence against a different victim, even though all crimes are part of an indivisible course of conduct with a single principle objective. (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 230.) The rule, "simply stated, permits one unstayed sentence per victim of all the violent crimes the defendant commits incidental to a single criminal intent. Where one person is the victim of both a shooting at an occupied motor vehicle and a simultaneous assault, the trial court can impose an unstayed sentence for one or the other, but not for both." (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1784.)

As noted by the People, defendant's counts 1 through 5 all involved pointing and/or shooting a rifle at Joseph's occupied car. Counts 1 through 3 were for assault with a firearm as to each victim; thus, by imposing prison terms on counts 2 and 3, the trial court complied with the multiple victim exception. However, because defendant was punished for his acts against each of the victims in counts 1 through 3, any imposed sentence for count 4 (shooting at an occupied vehicle (§ 246)) should have been stayed under section 654.

The parties dispute whether the sentence imposed for count 6 (felon in possession of a weapon) should have been stayed under section 654. Defendant contends that because his possession of the rifle was incidental to and simultaneous with the primary offense of assault with a firearm, section 654 precluded the imposition of sentences on both offenses.

Whether illegal possession of a firearm constitutes a divisible transaction from the offense in which that person employs the weapon depends on the facts and circumstances of each individual case. (*People v. Bradford* (1976) 17 Cal.3d 8, 22 (*Bradford*).) Where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. (*Ibid*.) Where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of a firearm has been held to be improper where it is the lesser offense. (*Ibid*.)

In other words, multiple punishment is improper where the evidence demonstrates that it was fortuitous circumstances that put the firearm in the defendant's hands only at the instant of committing another offense. In this context, one court has reduced the section 654 analysis to this legal principle: "[S]ection 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1145 (*Jones*).) Thus, in *Bradford*, the defendant was stopped by an officer for speeding. During the course of the stop, he wrested away the officer's revolver and shot the officer. (*Bradford*, *supra*, 17 Cal.3d at p. 13.) The California Supreme Court held that punishment both for assault with a deadly weapon upon a peace officer and possession of a firearm by an ex-felon was prohibited by section 654. (*Bradford*, *supra*, at pp. 22–23.)

However, multiple punishments are proper when the evidence shows the defendant possessed the firearm before the crime with an independent intent. In *Jones*, the defendant drove by a woman's home while illegally possessing a firearm and then shot at the woman's home. (*Jones*, *supra*, 103 Cal.App.4th at pp. 1141–1142, 1147.) The court held that Jones committed two separate acts in arming himself with a firearm and then shooting at the inhabited dwelling. Similarly, in *People v. Ratcliff* (1990) 223 Cal.App.3d 1401 (*Ratcliff*), when the defendant committed two robberies with a firearm within one and one-half hours, and a half hour after the robberies was still in possession

of the firearm, section 654 did not apply. (*Ratcliff*, *supra*, at pp. 1412–1413.) The defendant had already had the handgun in his possession at the time he arrived at the scene of the first robbery, and his possession of the weapon was not merely simultaneous with the robberies, but continued before, during and after those crimes. (*Id.* at p. 1413.)

This case is more like the situations in *Ratcliff* and *Jones* than the circumstances in *Bradford*. There was evidence defendant already had possession of the weapon before shooting at Joseph's car. K.F. testified defendant had the weapon earlier in the morning and shot the dog, and both K.F. and Joseph testified that when defendant used it to shoot at Joseph's car, he had retrieved it from the back of his own pickup truck. Defendant was also recorded in jail as telling his brother the gun had been abandoned "at Giovanni's." There was evidence defendant had taken possession of the gun well before the shooting occurred, and he did not seize upon the weapon "fortuitously 'at the instant of committing another offense ….'" (*Jones*, *supra*, 103 Cal.App.4th at p. 1145, quoting *Ratcliff*, *supra*, 223 Cal.App.3d at p. 1412.)

## IV.     *Dueñas* **Claim**[5]

The trial court imposed a $2,400 restitution fine under section 1202.4, subdivision (b)(1), and the court also imposed a corresponding parole revocation fine (§ 1202.45) in the same amount, which was stayed, a $40 court operations assessment per count for a total of $240 (§ 1465.8, subd. (a)(1)), and a $30 criminal conviction assessment per count for a total of $180 (Gov. Code, § 70373).

Relying on *Dueñas*, which was issued while this appeal was pending, defendant contends his fees and fines should be stayed or stricken.

In *Dueñas*, the court held the assessments under Penal Code section 1465.8 and Government Code section 70373 may be "imposed only on those with the means to pay them[]" (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1168–1169), and "that although the trial

---

**5**      *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

23.

court is required by … section 1202.4 to impose a restitution fine, the court must stay the execution of the fine until and unless the People demonstrate that the defendant has the ability to pay" (*id.* at p. 1172).

We decline to reach defendant's *Dueñas* arguments given remand of this matter for resentencing. Defendant may address his inability-to-pay assertion pursuant to *Dueñas* with the trial court in the first instance.

## DISPOSITION

Defendant's conviction for discharging a firearm with gross negligence (§ 246.3, subd. (a)) under count 5 is reversed. The sentence imposed for shooting at an occupied vehicle (§ 246) in count 4 must be stayed under section 654. The matter is remanded to the trial court with directions to resentence defendant in accordance with this opinion. At the time of resentencing, defendant may address his inability-to-pay argument under *Dueñas*. In all other respects, the judgment is affirmed.


MEEHAN, J.

WE CONCUR:


FRANSON, Acting P.J.


SNAUFFER, J.

24.